Commonwealth *v.* Williams, Appellant.

Argued June 12, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Roy Davis,* Assistant Public Defender, with him *Mervyn R. Turk,* Assistant Public Defender, for appellant.

*Vram Nedurian, Jr.,* Assistant District Attorney, with him *Ralph B. D'Iorio,* Assistant District Attorney, *William R. Toal, Jr.,* First Assistant District Attorney, and *Stephen J. McEwen, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, September 12, 1968:
Judgment of sentence affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:
On March 2, 1967, at about 9:30 a.m., Wilmer Johnson an employee of the Congoleum-Nairn Corporation

in Trainer, Delaware County, entered the door of the time-record department of the plant. At that time, he was carrying a paper ice bag containing money. As he entered the door, he noticed an individual in front of him at the card rack. A few seconds later, Johnson was struck from behind by another individual, knocked down, and the ice bag taken from him. When he got up, the person in front of him and the person who struck him from behind, were gone.

Appellant was subsequently identified in a line-up by Mr. Johnson as the person standing at the card rack. Appellant was then arrested and indicted for the crimes of robbery on two counts, larceny, and receiving stolen goods.

At appellant's trial, Mr. Johnson, the sole eyewitness to the robbery, was the Commonwealth's chief witness. He again identified appellant as the individual he had seen at the card rack the day of the robbery. Appellant testified that he was not near the plant on March 2, 1967, and presented alibi witnesses on his behalf.

Appellant was found guilty by the jury on the second count of robbery, and not guilty of the crimes of larceny, receiving stolen goods, and the first count of robbery.

Following the verdict, but prior to sentencing, appellant filed a motion for a new trial on the ground that there was after discovered evidence which would have affected the outcome of his trial. A hearing on this motion was held on January 26, 1968, and at the conclusion thereof, the motion was denied. On March 8, 1968, he was sentenced to a term of one to three years. This appeal followed.

A new trial in a criminal case will be granted on the basis of after discovered evidence where the evidence in question has been discovered after the trial

and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence. The evidence must not be merely corroborative or cumulative and may not be used solely for impeaching the credibility of witnesses. Furthermore, the evidence must be of such a nature and character that a different verdict will likely result if a new trial is granted. *Commonwealth v. Phillips*, 183 Pa. Superior Ct. 377, 132 A. 2d 733 (1957); *Commonwealth v. Moskovitz*, 142 Pa. Superior Ct. 325, 16 A. 2d 317 (1940); *Commonwealth v. Coroniti*, 170 Pa. Superior Ct. 245, 85 A. 2d 673 (1952).

A review of the evidence presented at the hearing held on January 26, 1968, is necessary to determine whether a new trial should be granted. At that hearing, appellant called two police officials who investigated the case. The first official to testify, Detective Hamilton, stated that soon after the robbery, the eyewitness, Mr. Johnson, was shown several pictures to see if he could identify the individual standing at the card rack.

Detective Hamilton testified: "Well, he viewed quite a few pictures at that time, and he said some looked like the men, but was not positive." [NT 11] Shortly thereafter, Mr. Johnson picked appellant out of a lineup as the man he had seen at the card rack the day of the robbery.

A couple of weeks later, Detective Hamilton and Detective Hoopes went to Mr. Johnson's home to further investigate the case. Mr. Johnson was again shown pictures, and Detective Hamilton testified that the following conversation ensued.

"Q. Officer, did you ask him if he knew who held him up that day?

"A. Yes, I did.

"Q. What was his answer?

"A. He did not know, he could not identify anybody at that particular time.

"Q. *And he could not say who robbed him at all?*

"A. *He could not say at all who robbed him.*" [NT 5] (Emphasis added) Detective Hamilton further stated that Mr. Johnson told him that he had ". . . identified Alonzo Williams because by putting him on the spot he would produce the others. . . . He felt as though by putting Alonzo on the spot Alonzo would tell and bring in the other boys." [NT 5-6]

The second official called at the hearing was Chief Flannery, Chief of the Chester County Police. He testified that Mr. Johnson had positively identified a person as his assailant, but later recanted. Specifically, the Chief stated:

"A. If I could explain the circumstances of this gentleman here, in the initial part of the investigation we took Womer here to the identification office over here and showed him a group of photographs, and this is on the 3rd of March, the next day afterwards. And he picked out this photograph here. I was there with one of the County detectives, Smedley, and he said positively he was the one. And as a result of that we had a warrant issued, which I have here, on Robert Wilkins.

"And then on the 4th of March while I was at the police station on duty, going over the case with Mr. Johnson here, coming out of the police station a car went by, and he hollered at me, There goes the man that did the job, which was Wilkins. I chased after the car and caught it in Chester. Wilkins had no driver's license and identification with him, and so I arrested him, put him in the police car with the complainant; and at that time he said he was the one. We went back to our police station, and in going over the case, in about a half-hour or thereabouts Womer

here said, No, he is not the one, he should have a goatee or something.

"Well, after being in his presence awhile he said that he is not the one; and as a result of that, after he was taken in front of the magistrate for the motor violation, he was actually discharged and that was the end of that." [NT 15-17]

The testimony taken at the hearing demonstrates that the sole eyewitness was unsure of the identity of the person he had seen the day of the robbery, and that he picked out the appellant in order to force him to name the parties implicated in the crime. Moreover, the evidence adduced at the hearing added new dimensions to the validity of the equivocal and uncertain identification given by Mr. Johnson at appellant's trial. Several portions of the record of the trial, quoted below, serve to exemplify this lack of positive identification.

"Q. Was he [the robber] standing or what was this man doing?

"A. [Mr. Johnson] He wasn't standing, he was bounding up and down this way, pulling his cap over his eyes *so I couldn't see him*; but I noticed his moustache very well . . ." [NT 6] [Emphasis added] Mr. Johnson also admitted that not only did he not get a good chance to view the person at the card rack, but could only see the person from the moustache down.

Mr. Johnson further testified that after he was hit "I could hear him but I couldn't see him, tears was all out of my eyes." [NT 9] He stated that once he fell to the floor that he didn't get up until the robbers had fled.

Appellant's counsel also asked Mr. Johnson the approximate time that he looked at the man standing at the card rack. His reply was:

"A. I only looked at him a second or so, and I walked right into him, when I walked right in, that was it, he [the man behind Johnson] grabbed me around my neck." [NT 20]

. . .

"Q. How long were you standing there looking at him?

"A. I say about one second; . . ." [NT 21] He also testified that he did not immediately recognize the man standing in front of him and that he recognized appellant only after he had gone to the police station for the line-up.

When further questioned about his identification of appellant, Mr. Johnson said that he studied the man at the card rack.

"Q. Well, you said that you were studying him and looking at him.

"A. I didn't have hardly a chance, not in a split second. I seen him bowing up and down, but in a split second this other one was on me." [NT 24]

In *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A. 2d 820 (1954), appellant alleged that there was insufficient testimony from an eyewitness in order to prove guilt beyond a reasonable doubt. Chief Justice BELL stated in the majority opinion that: "Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution . . .

"On the other hand, where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions, the

accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution." at 424.

The above quoted portions of the trial record illustrate that Mr. Johnson's identification testimony does not come within the perimeters of the clear, unequivocal identification testimony described in *Kloiber*. Rather, it shows that the eyewitness could not clearly see the person at the card rack because he had a hat pulled over a portion of his face and bobbed up and down. Moreover, Mr. Johnson only saw him for a split second. And, although Mr. Johnson stated that he had seen appellant before, he did not positively identify him until the line-up. Thus, Mr. Johnson's testimony at the trial was "doubtful" as to identification of appellant, and the new evidence produced at the January 26, 1968 hearing severely questioned the veracity of the only evidence to link appellant to the crime.

It must be noted that the statements made by Mr. Johnson to Detective Hamilton, and the incident of wrongful identification related by Chief Flannery, occurred prior to appellant's trial. Detective Hamilton did not testify at the trial and stated that he did not relate them to anyone until after the trial. Chief Flannery testified at the trial, but did not disclose the facts that he stated at the hearing on January 26, 1968. Consequently, none of this crucial evidence was made known at appellant's trial; it only came to light subsequent to the verdict and was made the basis of a special motion by appellant's counsel. After a thorough review of the record, it is my opinion that counsel could not have reasonably ascertained this evidence prior to the trial, and was, therefore, properly raised in a motion for a new trial based on after-discovered evidence.

Furthermore, the testimony taken at the hearing was not mere impeachment evidence. Rather, in light of the fact that Mr. Johnson's testimony was the only evidence to link appellant to the crime, the testimony taken at the hearing was very relevant, in fact crucial, to the case as a whole.

Nor did the testimony of Chief Flannery or that of Detective Hamilton corroborate any testimony given at trial. The statements made by the Chief were never elicited at the trial. Appellant's girlfriend, Shirley Potter, did testify that Mr. Johnson told her that he pointed out appellant at the line-up in order to force him to name the participants of the crime. Although a similar statement was made to Detective Hamilton, it was made to an unbiased police officer, rather than a person with a direct interest in presenting an alibi for appellant. Thus, the testimony of Detective Hamilton was not merely a difference in degree, but actually added another dimension to the equivocal identification testimony of Mr. Johnson. It should not be labeled generically as "impeaching," where such evidence questions the credibility of the entire testimony of the sole eyewitness to the crime.

In summary, the evidence adduced at the hearing held on January 26, 1968, subsequent to trial, not only severely undermined the credibility of the sole eyewitness, but very probably would have led the jury to a different conclusion. I would, therefore, find that appellant has produced sufficient after-discovered evidence to sustain the granting of a new trial.